ROBERT H. HALL AND DELORES A. HALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hall v. Commissioner
Docket No. 8338-80.
United States Tax Court
T.C. Memo 1982-605; 1982 Tax Ct. Memo LEXIS 143; 44 T.C.M. (CCH) 1418; T.C.M. (RIA) 82605; October 18, 1982. Peter Alpert, for the petitioners. Byron Calderon, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the 1976 and 1977 taxable years in the amounts of $2,911.11 and $3,469, respectively. The only issue for decision is whether certain payments made by petitioner Robert H. Hall to his former wife are in the nature of support, and therefore deductible under section 215, [1] or whether they are part of a property settlement. FINDINGS OF FACT Some of the facts have been stipulated and are so *145 found. At the time they filed their petition in this case Robert H. Hall (hereinafter petitioner) and Delores A. Hall resided in Fort Morgan, Colorado. They timely filed joint income tax returns for the years in issue with the Internal Revenue Service Center in Ogden, Utah. Petitioner married Wanda Louise Hall (hereinafter Louise) on November 9, 1947. They separated on July 25, 1974 and were divorced on November 22, 1974, after 27 years of marriage. They had one child, Steve, who was 19 years old and married at the time of the divorce. Neither petitioner nor Louise brought any substantial assets into the marriage. During the course of the marriage petitioner acquired five parcels of real estate located near an interstate highway interchange in Fort Morgan. The parcels were collectively known as the Wayward Wind Complex, and included a Texaco service station with an attached restaurant and lounge, a liquor store, a campground and mobile home park with a single family residence, a lot with a small industrial building, and a vacant lot. In addition to the foregoing, petitioner also owned and operated a bulk sales distributorship of Texaco products including oil, gas, diesel *146 fuel, tires and other automotive products. Petitioner worked throughout the marriage in developing and operating his various business and real estate interests. On June 28, 1974, the bulk sales business and the service station with adjoining restaurant and lounge were incorporated under the name R.H. Bob Hall, Inc. On July 5, 1974, 1,000 shares of stock were issued to Steve Hall and 2,000 shares were issued to petitioner. They were the sole stockholders of the company. Louise had only a high-school education and worked for the Mountain Bell Telephone Company from the time she was married until the birth of her son in 1955. During that year her husband purchased the bulk sales distributorship using $1,000 from her savings account to help finance the acquisition. In 1966 she began working in the bulk sales business on a regular basis. She performed a number of different services including bookkeeping, moving trucks, delivering oil, collecting accounts receivable, and other office work. She participated actively in the business until the latter part of 1971, when the couple began developing the Wayward Wind complex. Thereafter Louise assumed full responsibility for keeping *147 the books of the liquor store. Louise did not own a legal interest in petitioner's businesses or real estate prior to the divorce. However, as a result of gifts from her father she did own the right to receive $20,000 of the proceeds from the sale of his farm, and also owned a one-half remainder interest in his personal residence. By the time the divorce decree was entered on November 22, 1974, the parties had not yet reached an agreement on the division of their property and payment of alimony, if any. Thus, the divorce court retained jurisdiction over these matters until an acceptable compromise was worked out. On December 27, 1974, the parties executed a document entitled "Maintenance and Property Settlement Agreement" (Agreement), which contained the following provisions concerning cash payments to Louise: 1. MAINTENANCE: Bob will pay Louise the sum of $8,500.00 prior to January 1, 1975. No additional sums shall be payable for maintenance to Louise until June 1, 1975 at which time Bob shall commence making $1,000.00 per month payments which shall continue on the first of each month thereafter until a sum of $194,400.00 has been paid to Louise by monthly payments *148 which in addition to the $8,500.00 payment payable prior to January 1, 1975 shall result in total payments to Louise in the amount of $202,900.00. There shall be no interest payable on the unpaid balance. These payments shall continue irrespective of whether or not Louise remarries and shall be payable to her estate in the event she dies prior to receipt of all payments. The unpaid balance will be secured by declining term insurance policies satisfactory to Louise and her attorney, E. Ord Wells, which shall at all times have a balance equal to or in excess of the unpaid balance due Louise. The proceeds from these policies shall be payable to Louise in the same manner and amounts as required by this Agreement and any excess over and beyond such payments will be payable to Bob's estate. A separate life insurance trust was established to provide for continuation of the "Maintenance" payments in the event petitioner died before his obligations under the Agreement were satisfied. The payments were scheduled to end when Louise reached age 62, at which time she would begin receiving Social Security benefits. Under a separate heading entitled "Division of Property" the Agreement *149 provided for the distribution of the parties' assets. Petitioner conveyed all of his "right, title and interest" in the family residence to Louise, subject to an existing mortgage of $8,500 which Louise agreed to assume. Louise also received all of the household furniture and one of the two family cars. She retained any and all property interests acquired by inheritance or otherwise from her parents, and each party kept his or her personal savings accounts, stocks, bonds or other items of separately held personal property. Petitioner retained sole ownership of the businesses and real estate, as follows: D. Bob shall retain as his own the sole ownership of the following: (1) The stock presently in his name in R.H. "Bob" Hall, Inc. (2) All stock in his name in United Campgrounds, U.S.A. of Fort Morgan, Inc. (3) All assets, whether personal or real, of the Wayward Wind Liquor Store. (4) All equipment, fixtures, furnishings and equipment, accounts receivable, and real or personal property used in connection with the operation of the Texaco bulk plant on East Burlington Avenue, Fort Morgan, Colorado, the Wayward Wind Mobile Home Park and United Campgrounds as well as all *150 real property in Bob's name together with the rents and profits arising therefrom. The Agreement did not specify values for the properties described therein. Petitioner paid Louise $500 per month in temporary support payments from the date of their separation on July 25, 1974 until December 27, 1974. The couples' combined net worth as of November 22, 1974, excluding any separately held bank accounts and securities and property received by gift or inheritance from extramarital sources, was $298,351. In December 1974 petitioner paid Louise $8,500 pursuant to the terms of the Agreement. On June 1, 1975 he paid her $7,000 in a lump sum to discharge his monthly obligation for that year. He paid her a total of $12,000 during each of the years 1976 and 1977. Respondent disallowed petitioner's deductions for these latter two payments on the ground that they were not "alimony." OPINION Section 71(a) includes in a wife's gross income periodic payments received in discharge of a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under a divorce decree or written instrument incident to the divorce. Section 215 allows *151 a deduction to the husband for payments made to his wife which are includable in her income under section 71. The requirement that the payments be made in discharge of a legal obligation imposed "because of the marital or family relationship" has been interpreted to require that the payments be in the nature of support rather than a property settlement. ; ; secs. 1.71-1(b)(4) and 1.71-1(d)(3)(i)(b), Income Tax Regs. The "periodic" requirement of section 71(a) is amplified in section 71(c). Section 71(c)(1) states that installment payments which discharge an obligation to pay a principal sum specified in a divorce decree or separation agreement cannot qualify as periodic payments. An exception to this general rule is provided in section 71(c)(2), which states that installments which are to be paid over a period ending more than 10 years from the date of the decree or agreement will be considered periodic payments, but only to the extent of 10 percent of the principal sum in any one taxable year. In the present case petitioner was required under the Maintenance *152 and Property Settlement Agreement to make an initial payment to Louise of $8,500 prior to January 1, 1975, and an additional sum of $194,400 payable beginning June 1, 1975, at the rate of $1,000 per month. Respondent concedes that the payments in issue qualify as periodic payments under section 71(c)(2). However, he contends that they are nondeductible because they effected a property settlement and did not arise out of a marital support obligation. Petitioner takes the contrary position. It is well settled that the determination of whether payments are in the nature of support or part of a property settlement does not turn on the labels assigned to the payments by the court in the divorce decree or by the parties in their agreement. , affd. without published opinion ; ; , affd. . The issue is a factual one and requires an examination of all the surrounding facts and circumstances. , *153 affd. ; . Factors which indicate that the payments are in the nature of a property settlement rather than a support allowance are: (1) that the parties in their agreement (or the court in its decree) intended the payments to effect a division of their assets, , affg. per curiam a Memorandum Opinion of this Court; ; (2) that the recipient surrendered valuable property rights in exchange for the payments, ; ; ; (3) that the payments are fixed in amount and not subject to contingencies, such as the death or remarriage of the recipient, ; , affg. a Memorandum Opinion of this Court; ; *154 (4) that the payments are secured, ;; (5) that the amount of the payments plus the other property awarded to the recipient equals approximately one-half of the property accumulated by the parties during marriage, , affg. a Memorandum Opinion of this Court; ; (6) that the need of the recipient was not taken into consideration in determining the amount of the payments, ; and (7) that a separate provision for support was provided elsewhere in the decree or agreement, . Conversely, the absence of one or more of the above factors may tend to indicate that the payments are more in the nature of a support allowance. See generally , on appeal (9th Cir., June 15, 1982). We begin by examining the property and alimony rights to which a divorcing spouse is *155 entitled under Colorado law. Colo. Rev. Stat. (CRS) sec. 14-10-113 (1973) governs the disposition of property. It directs the court to divide the "marital property" in a "just" manner without regard to any marital misconduct. In making the division, the court is to consider a number of factors, including: (1) the contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as a homemaker, (2) the value of the property set apart to each spouse, (3) the economic circumstances of each spouse, and (4) any increases or decreases in the value of the separate property of each spouse during the marriage, taking into account the extent to which such property is depleted for marital purposes. "Marital property" is defined as any property acquired subsequent to the marriage by either spouse regardless of legal ownership, but excluding, among other things, property acquired by gift, bequest, devise or descent. According to the Colorado Supreme Court, "the purpose of the division of marital property is to allocate to each spouse what equitably belongs to him or her." . *156 The division is within the discretion of the trial court and need not be equal. . In addition to an award of marital property, a spouse may also be entitled to an award of maintenance under CRS sec. 14-10-114 (1973). Such an award is made only if (1) the court determines that a spouse lacks sufficient property, taking into account his apportioned share of marital property, to provide for his reasonable needs, and (2) the spouse is unable to support himself through appropriate employment. The amount and duration of the maintenance award must be "just" and are determined with regard to such factors as the age, health, need and earning capacity of the recipient, the standard of living established during the marriage, the duration of the marriage, and the other spouse's ability to pay. In , the Colorado Supreme Court was asked to characterize the rights of a spouse under the marital property statute which preceded CRS sec. 14-10-113. The former *157 statute (CRS sec. 46-1-5 (1963)) called for a "fair and equitable" distribution of the marital property at divorce and was similar in many respects to the present statute. The court concluded that a spouse's rights under the statute automatically vested upon the filing of the divorce petition, even though the actual amount of property to be distributed was indeterminate at that point. Thus, it held that a transfer of property in satisfaction of such marital rights was in "recognition of a 'species of common ownership' of the marital estate by the [recipient] resembling a division of property between co-owners." . The Court of Appeals for the Tenth Circuit considered this interpretation of the Colorado Supreme Court in , affg. a Memorandum Opinion of this Court. The issue in that case was whether periodic payments made by the taxpayer pursuant to a Colorado divorce were in the nature of deductible support or a nondeductible property settlement. His wife argued that the payments effected a division of property between co-owners in recognition of her vested marital property rights, *158 even though she had no legal title to her husband's property. The Tenth Circuit rejected this view, however, and held that most of the payments were in satisfaction of a "marital obligation" rather than "actual" ownership rights, even though the Colorado Supreme Court had labeled the spouse's inchoate rights in the marital property as a "species of common ownership" which vests upon the filing of the divorce petition. . Thus, those payments were held to be taxable to the wife and deductible by the husband. Were this the only pronouncement of the Tenth Circuit on this issue, we might be inclined to follow our rule in , affd. , and hold that the payments herein were necessarily in the nature of support because Louise had no "actual" ownership rights in her husband's property. However, it appears that the Court of Appeals has softened its stance in this area considerably since it affirmed Hayutin, and is edging closer to the more flexible approach which this Court has adopted in recent decisions. In , *159 the Tenth Circuit held that no gain was realized on the transfer of appreciated property between a Colorado couple in a divorce settlement because the transfer was essentially a division by co-owners of jointly owned property and therefore outside the scope of the rule established in . In contrast to its analysis in Hayutin, the court based its affirmance on the Colorado Supreme Court's characterization of a spouse's marital property rights as a "species of common ownership." See It distinguished Hayutin on the ground that that case involved different Code sections (i.e., sections 71 and 215 rather than section 1001) and also made the observation that the court's comments on Colorado law were "not essential to its decision." . We wonder, though, whether the cases can be reconciled so easily. It would appear to us that ownership rights which are sufficient to avoid triggering Davis gain should necessarily be sufficient to support a property settlement for purposes of section *160 71. [2]
In any case, the Tenth Circuit has recently given a clear indication that "actual" ownership rights are not a prerequisite to a finding of a property settlement. In , affg. a Memorandum Opinion of this Court, this Court held that certain payments made by the taxpayer to his former wife pursuant to a Wyoming divorce were intended to equalize the property of the parties and were nondeductible. In affirming our decision, the Tenth Circuit was careful to note that under Wyoming law the trial court is required to make a just and equitable, but not necessarily equal, division of the property accumulated by the parties--a division similar to that required under Colorado law. . Yet, without *161 referring to the "actual ownership" language of Hayutin, the Court of Appeals concluded that the payments in question were part of an attempt to equalize the property of the parties in accordance with Wyoming law and were nondeductible. See also , affd. affd. USTC par. 9514 (10th Cir. 1982). Under these circumstances, we feel free to apply our own rule in the property settlement-support area, which is that preexisting legal or "actual" ownership rights need not be present in order for payments to be considered part of a property settlement. See and also note 9. The key question is whether the payments were in satisfaction of a support obligation as opposed to some form of property right. In this case the parties started out their 27-year marriage with basically nothing and ended up with a number of businesses and a sizeable net worth. Although it is undisputed that petitioner was the driving force in developing these businesses, Louise's marital contributions were by no means insubstantial. She was a homemaker, *162 a wage earner (during the years she was employed by the Mountain Bell Telephone Company) and was actively involved in her husband's business endeavors, performing such tasks as bookkeeping, office management and customer deliveries. We have little doubt, under the circumstances, that a Colorado court would have awarded Louise a substantial share of the marital property in a divorce settlement under the authority of CRS sec. 14-10-113. Since petitioner received all of the businesses and real estate (excluding the family residence) under the property settlement, we think that at least some portion of the cash payments received by Louise were in exchange for her rights in her husband's property and thus were in the nature of a property settlement. The problem is to determine how much of the payments fall into that category. We agree with respondent that the "maintenance" nomenclature used by the parties in their Agreement is of little probative value in resolving this issue. [3] The same can also be said for much of the parties' testimony, which predictably fell at opposite ends of the spectrum on the question of the true purpose of the payments. However, *163 the payments do exhibit certain objective indicia of a property settlement, such as the fact that they are secured, part of a fixed principal sum and not subject to any contingencies. On the other hand, there are other facts which suggest a significant support component. First, petitioner's attorney in the divorce negotiations testified that the payments were deliberately scheduled to terminate when Louise reached age 62 and began receiving Social Security benefits. This allows the inference, at least, that one form of support was to be replaced with another. Second, Louise's career opportunities, given her age, education and experience, were probably somewhat limited. Third, she had no substantial resources of her own at the time of the divorce. Fourth, Louise received temporary support payments during the period of their separation. Fifth, and most importantly, the evidence indicates that the total property received by Louise in her divorce settlement substantially exceeded one-half the couple's net worth. *164 Arriving at a reasonable net worth approximation has proved to be somewhat difficult, since the Agreement of the parties does not assign values to the various items in the marital estate. Petitioner has supplied us with a personal financial statement, apparently prepared in anticipation of trial, which purports to show the value of the marital property as of May 13, 1974. The statement incorporates the results of a comprehensive hindsight appraisal prepared by a professional real estate appraiser in 1982, which lists appraised values as of December 27, 1974 for the land and buildings located in the Wayward Wind Complex. After deducting the value of Steve Hall's one-third interest in R.H. Bob Hall, Inc., as well as the outstanding business indebtedness and residential mortgage, the financial statement lists petitioner's net worth as $227,350. However, respondent has introduced two other financial statements which were prepared by petitioner in 1974 in connection with a commercial loan he obtained from the First National Bank of Fort Morgan, and they indicate a substantially higher net worth. The statements are prepared on standard bank forms and are both dated May 13, 1974. *165 One lists all of the couple's assets, including businesses, home, cars and furniture, and arrives at a net worth of $796,497. The other lists the same assets with different values in some cases and arrives at a net worth of $341,826. According to petitioner, the larger estimate was purposefully inflated at the suggestion of his banker in order to enable him to borrow additional money on an "as needed" basis without running afoul of the bank's internal loan policies. His testimony is supported by an internal bank memorandum dated May 20, 1974, which suggests that both the liquor store and mobile home park and campground were substantially overvalued. Thus, we tend to discount this statement as an accurate portrayal of petitioner's true financial condition. The other statement, however, does not appear to have been "doctored" in any way. For a number of reasons, we think this second statement is of greater reliability and probative value than the hindsight statement prepared in 1982. First, the statement was contemporaneous, having been prepared within six months of the divorce. Second, petitioner testified that the values therein were as accurate as he could determine based *166 on his knowledge at the time. Third, he also stated that the statement was the one which the parties "used to settle on," and thus it would seem to have the greatest bearing on the parties' actual intentions in determining the amount of Louise's cash payments. Fourth, the professional appraiser hired by petitioner in connection with the hindsight statement testified that he was hired to appraise only the land and buildings, and made no attempt to appraise the going concern value of petitioner's businesses. We agree with petitioner that some adjustment to the 1974 net worth figure is necessary to reflect the subsequent incorporation of the bulk sales distributorship and service station/restaurant facility and transfer of one-third of the stock to Steve Hall. The value of Steve's ownership interest cannot, in our view, be considered a part of the marital estate available for distribution. [4] We have determined the value of that interest to be $43,475. [5] Subtracting this amount from the net worth shown on the bank financial statement ($341,826) yields an adjusted net worth of $298,351. This figure includes not only the land and business, but also the family residence, furniture *167 and cars. It does not take into account any separately owned bank accounts, securities, or inherited or gifted property. *168 With this revised figure we will now make what we think is a fair estimate of the percentage of the periodic payments which represents a property settlement. We think it reasonable to assume that the most Louise could have expected, or probably would have been legally entitled to, in the way of a property settlement would have been one-half of the marital property, or $149,176. [6] In fact, she received equity in a home worth $31,500, home furnishings worth $6,000, a car worth $2,250, and periodic cash payments totaling $202,900, representing a total value of $242,650. On this record, taking into account all the relevant facts and circumstances, we conclude that a fair and reasonable approach would be to assume that $93,474 ($242,650 - $149,176) of this total was paid as support, and that 38.5 percent ($93,474 / $242,650) of the cash payments each year are deductible under section 215. This works out to a $4,620 deduction for each of the taxable years in issue. [7] We recognize that our method is only an approximation, but we have done the best we can with a factual issue which is simply not susceptible to precise determination.The simpler alternative would have been an all-or-nothing *169 approach; however, in our judgment this would not have fairly reflected the dual character of the payments. To give effect to our conclusions, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, unless otherwise indicated.↩
2. We should emphasize, however, that the reverse does not necessarily hold true--i.e., property rights which would support a property settlement in the context of section 71 will not in every case rise to the dignity of co-ownership described in the Davis↩ opinion and enable a transferor of appreciated property in a divorce settlement to escape taxation on his gain.
3. Our doubts as to the significance of the "maintenance" label are underscored by the following excerpt from a letter dated October 3, 1974, written by petitioner's attorney to Louise's attorney during the divorce negotiations: I explained to [petitioner] that often in property settlement agreements the form of the settlement is set forth in such a way that the husband can claim the payments as alimony or maintenance and, therefore, deductible to himself with the requirement that the wife pay income tax on it. However, I advised him that in order to do this it would be necessary for him to pay her such additional amounts as would cover her income tax so that she would have the same net amount as agreed upon.↩
4. No issue has been raised as to whether the transfer of stock to Steve should be disregarded on the ground that it was a fraudulent attempt to deprive Louise of her marital rights. Louise apparently did not challenge the conveyance during the divorce negotiations and we have assumed its validity for purposes of this case. Our approach is consistent with the general rule in Colorado that a spouse is free to dispose of his property as he sees fit during the marriage and absent any divorce action. See . ↩
5. Using the values contained in the 1974 financial statement, and guided by note C of the 1982 statement, which lists the assets and liabilities transferred to R.H. Bob Hall, Inc., we have computed the value of Steve's interest as follows: ↩
Cash
$ 2,508 Receivables
16,908 Station inventory and equipment
9,310 Bulk tanks and pumps
32,000 Tank trucks
52,700 Station and restaurant
250,000 Two-way radios
3,500 Miscellaneous tools and supplies
2,500 Vacant land
35,000 Total assets
404,426 Less: liabilities
(274,000)
Net corporate equity
$130,426 Steve's one-third interest
$ 43,475 6. In this regard, we note that petitioner's attorney testified that his understanding of Colorado law was that the marital property was normally split "just about right down the middle." Louise also was of the opinion that she was entitled to a 50-50 split. ↩
7. Our approach does not take into account present value considerations because there is no evidence in this record that any of the $93,474 excess amount received by Louise was intended to compensate her for the use of her money during the 16-year payout period. We will not impute an interest factor for purposes of determining the alimony/property settlement breakdown where the parties have failed to so specifically. See , affd. USTC par. 9514 (10th Cir. 1982).↩